UNITED STATES of America

v.

Joseph M. JOYNER, Appellant.

UNITED STATES of America

v.

Calvin F. SMITH, Appellant.

Nos. 73–1110, 73–1169.

United States Court of Appeals, District of Columbia Circuit.

Feb. 11, 1974.

Rehearings Denied March 6, and March 14, 1974.

Monica Gallagher, Sherman L. Cohn, Washington, D. C., and Warren E. Connelly,* were on the brief for appellant in No. 73–1110.

Paul M. Tschirhart, Washington, D. C., (appointed by this Court) was on the brief for appellant in No. 73–1169.

Harold H. Titus, Jr., U. S. Atty., John A. Terry and Garey G. Stark, Asst. U. S. Attys., were on the brief for appellee. Robert J. Higgins, Asst. U. S. Atty., entered an appearance for appellee.

Before McGOWAN, ROBINSON and ROBB, Circuit Judges.

PER CURIAM:

The appellants were convicted of the murder of John R. Turner. The killing occurred at Turner's house, 4709 Sheriff Road, N.E., shortly after 8:00 A.M. on June 11, 1971. There was evidence that at that time a man entered the house, a gunshot was heard, and immediately thereafter two other men went in.

Police arrived at the house at 8:45 A. M. in response to an alarm given by Turner's wife. They found Turner's body lying on the floor of the front room in a pool of blood. The place had been ransacked and Turner's desk had been pried open.

Jay Street runs parallel to Sheriff Road one block to the rear of the Turner house and can be reached by way of alleys, or paths, leading from Turner's back door. There was evidence that at about 8:25 A.M. on June 11 a black and white Cadillac convertible, not belonging to anyone in the neighborhood, was parked in the 4600 block of Jay Street, and that about 8:30 A.M. three men got into the Cadillac and drove off.

At about 9:10 A.M. a police tracking dog named Eric, accompanied by his handler, followed a trail from the Turners' rear door through the alleys and pathways to Jay Street and finally stopped on the sidewalk at the point where the black and white Cadillac had been parked. The Police Department's Chief Instructor for training of police dogs, a qualified expert in the field of training and observing tracking dogs, was called as a witness. He described and explained the methods of training and the actions of dogs on a track, and expressed his opinion as to the general reliability of the Police Department's trackers. In response to a hypothetical question he gave his interpretation of

* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this Court.

the actions of Eric on the morning of June 11.

Turner was an agent of Nationwide Money Order and Check Corporation and maintained an office in his house for the sale of Nationwide money orders. The apparent motive for his murder was robbery. An inventory after his death disclosed that ninety-three Nationwide money orders were missing.

Joyner was arrested in West Palm Beach, Florida, on June 28, after he attempted to pass one of the Nationwide money orders taken in the Turner robbery. Another Nationwide money order was found in his pocket and there was evidence that on June 23, in Washington, using as assumed name, he negotiated a third stolen Nationwide money order.

Sharon White, the woman with whom Joyner was living, testified that on the day of the killing he admitted to her that he shot Mr. Turner. On the same day he changed his appearance by shaving off his sideburns and goatee; and he made a telephone call in an effort to locate someone who had "a money order machine". The government proved that Joyner's palm print was on Turner's file cabinet and two of his fingerprints were on a knife blade which apparently had been used to pry open Turner's desk. Without mentioning other items of proof that incriminated Joyner, it is enough to say that the case against him was overwhelming.

Sharon White testified that beginning in April 1971 she knew Smith as a friend of Joyner. She saw Smith several times, usually when he came to the Joyner-White house in his black and white Cadillac convertible. On several occasions during this period she spoke with Smith over the telephone. She testified that at six o'clock on the morning of the murder she was awakened by the telephone. Answering, she recognized the voice of Smith, who asked to speak with Joyner. Miss White passed the instrument to Joyner who said: "Yes, okay. Are you on your way now?" About twenty minutes later Sharon White heard several short blasts of an automobile horn, in rapid sequence, which she recognized as a signal habitually used by Smith. Joyner then left the house.

Miss White testified further that on June 16 she was present when Joyner asked Smith "where was the rest of the money orders and Calvin told him that he wasn't trying to get out on him, that Willie had the rest of the money orders, and so Jose [Joyner] said where was Willie, and he said he was around somewhere." On the following morning Joyner went out and when he returned he said he had the rest of the money orders, "about three or four thousand dollars worth".

Witnesses testified that on June 16 or 17 Smith attempted to find someone who could cash or "move" twenty to thirty Nationwide money orders, which he had in a brown paper bag in the trunk of his Cadillac. There was evidence that at least three of the money orders were Nationwide money orders similar to those taken from Turner.

When Joyner was arrested in West Palm Beach on June 28 he was accompanied by Sharon White. She was released and returned to Washington on the night of July 2. At five o'clock on the morning of July 3 she was awakened by the sound of Smith's automobile horn. He wanted to talk. He said he had heard that she and Joyner had been arrested in Florida and he wanted to know where Joyner was and whether Sharon White had made any statement to the police. Frightened, she told Smith she had made no statement.

Smith was arrested in Washington on July 6. At the time he was in his black and white Cadillac convertible. He was carrying a loaded .38 caliber revolver.

The jury found each of the appellants guilty of felony murder (22 D.C.Code § 2401); first degree burglary (22 D.C. Code § 1801(a)); and armed robbery (22 D.C.Code § 2901).

Pursuant to what seems to be a proclivity for supererogation the government included in the indictment counts charging each appellant with carrying a

pistol without a license on the day of the murder; and another count charged Smith with carrying a pistol without a license on the day of his arrest. It was stipulated that Smith's pistol was not the one used in the homicide. All three pistol counts were dismissed before the case was sent to the jury.

■ On this appeal both appellants contend that the District Court's instruction on recently stolen property improperly placed the burden on the defendants, alone, to explain satisfactorily their possession of the money orders. They point to the language approved by this court in Pendergrast v. United States, 135 U.S.App.D.C. 20, 35, 416 F. 2d 776, 791, cert. denied, 395 U.S. 926, 89 S.Ct. 1782, 23 L.Ed.2d 243 (1969):

In considering whether the defendant's possession of the recently stolen property has been satisfactorily explained, you must bear in mind that the defendant is not required to [take the witness stand or] furnish an explanation. His possession may be satisfactorily explained by other circumstances shown by the evidence independently of any testimony by the defendant himself.

The court's instruction, say the appellants, told the jury in effect that the burden was on the defendants themselves to testify in explanation of their possession. We think however that the charge does not suffer from this vice.

The challenged instruction began with these paragraphs:

If you find beyond a reasonable doubt that a defendant or defendants had exclusive possession of money orders stolen from Mr. John Turner recently after that property was stolen, you may infer from the unexplained or unsatisfactorily explained possession of those money orders, that the defendant or defendants are guilty of taking that property from Mr. Turner.

You must consider whether such inference is warranted by the evidence as a whole. You are not required to draw such inference, but you may do so.

The defendant's possession of recently stolen property does not shift the burden of proof. The Government always has the burden of proving beyond a reasonable doubt every essential element of an offense. (Tr. 718).

Thereafter the court referred to the failure of a defendant to explain his possession "by satisfactory evidence" or "by any of their [his] evidence". Previously the jury had been instructed that "Every defendant in a criminal case has the absolute right not to testify. You must not draw any inference of guilt against the defendants because they did not testify . . . ." (Tr. 697).

Taking the charge as a whole we think it did not focus upon the defendants alone as the source of evidence that might explain their possession of the money orders. On the contrary, we think the jury was given to understand that the explanation might have come from any evidence introduced by the defendants.

■ The appellant Joyner claims that the proof of Eric's tracking from the Turners' back door to Jay Street was inadmissible because there was no evidence that the killers of Turner had left by the back door. The argument misses the mark. The critical fact shown by the evidence was that a track led from the Turner house to the spot where the getaway Cadillac had been parked. Whether the track led from the back door or the front door had nothing to do with the admissibility of the evidence.

The testimony of the Police Department expert was competent. *See* United States v. Jackson, 138 U.S.App.D.C. 143, 425 F.2d 574 (1970); Goldwater v. Ginzburg, 414 F.2d 324, 343 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S. Ct. 701, 24 L.Ed.2d 695, rehearing denied, 397 U.S. 978, 90 S.Ct. 1085, 25 L. Ed.2d 274 (1970).

■ Smith complains that he was prejudiced by the court's refusal to sever the count charging him with carrying a pistol on the day of his arrest. Properly joined under Rule 8(a), Fed.R.

Crim.P., the count was dismissed for failure of proof before the case was submitted to the jury; and the indictment was retyped, omitting this count. (Tr. Oct. 27, 1972, p. 523). In the circumstances we think Smith was not prejudiced. We also reject his argument that the court should have granted him a severance because of the misbehavior of Joyner before the jury. United States v. Aviles, 274 F.2d 179, 193 (2d Cir.), cert. denied, Evola v. United States, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); United States v. Bentvena, 319 F.2d 916 (2d Cir.), cert. denied, Ormento v. United States, 375 U.S. 940, 84 S. Ct. 345, 11 L.Ed.2d 271 (1963), rehearing denied, 397 U.S. 928, 90 S.Ct. 894, 25 L.Ed.2d 108 (1970).

Appellate counsel for Smith argues that the prosecutor's closing argument was inflammatory, prejudicial and so improper as to constitute plain error. He claims the prosecutor invoked inferences and drew conclusions not based upon the record and improperly commented on the failure of the defendants to testify. These contentions are made for the first time on appeal; none of the experienced trial counsel made any objection to the prosecutor's argument.

■ Having carefully examined the transcript of the trial and the prosecutor's closing argument we conclude that he did not exceed the bounds of legitimate advocacy. He drew fair inferences from the evidence. Contrary to the contention of appellate counsel he did not comment on the failure of the defendants to testify but merely pointed out to the jury that in their closing arguments counsel for the defendants had not challenged the testimony of government witnesses on certain critical matters.

■ We think it appropriate to comment specifically on the contention of Smith's appellate counsel that the prosecutor was guilty of "suppression of evidence" at the trial. (Smith Br. p. 50).

Smith and Joyner were tried twice, the first trial having been aborted. Appellate counsel now cites evidence at the first trial that Nationwide Money Order and Check Corporation made two deliveries of money orders to Turner in May of 1971, one delivery on May 18, and the second on May 20, 200 money orders being delivered on each date. From this foundation counsel argues that at the second trial the prosecutor omitted any "reference to the May 20 delivery so as to have the jury believe that only 200 money orders were involved instead of 400." (Smith Br. p. 49). Then, says appellate counsel, the prosecutor argued that since there were 93 missing money orders, and Smith had some 30 of them, he had one third of the proceeds from the robbery. Counsel argues that if the jury had known there were 200 other money orders "floating around" and unaccounted for Smith's share would have been smaller and the government's "⅓ partner" theory would have been discredited.

Since according to appellate counsel the facts were fully developed at the first trial and since the same counsel represented Smith at both trials, it is difficult to understand the contention that evidence brought out at the first trial was concealed and suppressed at the second. Without attempting to solve this puzzle, however, we find that counsel's argument is otherwise unsupported by the record. At the first trial the evidence was that on May 18, 200 money orders in Series No. 53749551–750 were delivered to Turner, and on May 20, 200 more orders in Series No. 53250101–300 were delivered. (Tr., May 16, 1972, pps. 628, 629). The testimony was that an inventory disclosed a total of 93 missing money orders. (Tr., May 15, 1972, p. 558). At the second trial the testimony was that 93 money orders were missing, 53 from Series No. 53749551–750, and 40 more "in a different series". (Tr., Oct. 27, 1972, p. 488). Thus no money orders were left "floating around" and unaccounted for. The prosecutor's argument was firmly grounded in the evidence and appellate counsel's attack is unwarranted.

The judgments are

Affirmed.