**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Henry LAVADO, Jr., Rafael Antonio Garcia-Andriany, Lee Roy Sawyer, Alexander Molina, Nicanor Carranza-Villa, Alejandro Ferreira-Rengifo, Orlando Velasquez-Silva, Defendants-Appellants.**

**No. 83–5285.**

United States Court of Appeals, Eleventh Circuit.

Jan. 24, 1985.

---

1528

Thornton, Rothman, Adelstein & Moreno; Leon E. Sharpe, Miami, Fla. (court-appointed), for Lavado.

William S. Isenberg, Fort Lauderdale, Fla., for Garcia-Andriany.

Lee Roy Sawyer, pro se.

Alexander Molina, pro se.

William M. Norris, Linda Collins-Hertz, Kathleen M. Williams, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Humberto J. Aguilar (court appointed), Fernandez, Caubi, Fernandez & Aguilar, P.A., Miami, Fla., for Carranza-Villa.

Robyn J. Hermann, Public Defender, Charles M. Auslander, Asst. Federal Public Defender, Miami, Fla., for Alejandro Ferreica-Renigfo.

Kathy Hamilton, Coral Gables, Fla. (court appointed), for Orlando Velasquez-Silva.

Geoffrey C. Fleck, Weiner, Robbins, Tunkey & Ross, Miami, Fla., for Sawyer & Molina.

Before GODBOLD, Chief Judge, HILL, Circuit Judge, and PECK *, Senior Circuit Judge.

GODBOLD, Chief Judge:

Defendants are a group of three Americans and four Colombians convicted of conspiracy to possess with intent to distribute marijuana while on board a vessel subject to the jurisdiction of the United States [1] and possession with intent to distribute marijuana.[2] All the convictions are affirmed.

## FACTS

A Coast Guard cutter was searching for a disabled small boat off the west coast of south Florida. It came upon a small and large boat together, approached them, and both fled. The cutter followed the larger boat, pulled alongside, and attempted to get it to stop. The cutter crew observed persons scrambling around in the cabin and a chart thrown out of the cabin window. The cutter stopped, retrieved the chart, and detected the odor of marijuana from it. The cutter resumed the chase and succeeded in stopping the boat after displaying a weapon. The crew heard Spanish being spoken on the boat and saw seven people aboard. Three were later recognized as the American defendants. While the two vessels were stopped they were 15 to 20 feet apart, in calm waters and during daylight hours. The odor of marijuana could be detected emanating from the boat.

The apparent skipper of the boat demanded that the Coast Guard board or he would leave. After some argument the boat took off, with the cutter in pursuit, in the direction of Marco Island. The chase continued into the night. Finally the boat ran aground on Keewayden Island, and all of its crew jumped off and ran into nearby woods. The Coast Guard boarded the boat and found no one aboard but found 128 bales of marijuana. Among items found aboard were postcards, a newspaper from Barranquilla, Colombia, and a business card with the name Henry Lavado on it.

The name "Barbara Ann" was affixed to the boat by a sign; underneath the sign was the name, "Yenya." A vessel named Yenya had been boarded about a month earlier by the Coast Guard in the passage between Haiti and Cuba. One of the persons aboard had identified himself as Henry Lavado and stated that he was the operator of the boat.

The Coast Guard notified the county sheriff's office and the Florida Marine Patrol of the circumstances of the chase and the beaching of the boat. A search commenced on Keewayden Island at about 10:00 to 10:30 p.m. The island is in a remote area, but there are about ten weekend cottages located on it and one private club with cottages. About an hour and a half after the search began an officer saw persons running and shot over their heads; three persons dropped to the sand. When the officer identified himself one of the group responded "Colombians." After the three were taken to a patrol boat one of the three shouted something in Spanish and gestured toward the beach. An officer shined a light on the beach and spotted another person, who was apprehended. A tracking bloodhound, Jessie, and her trainer had been following a trail to the area where the suspects were apprehended. When Jessie was placed aboard the patrol boat she went up to the four suspects and sniffed them. This was her way of indicating the source of a scent or scents she had been following. She sniffed no one else on the boat.

The following morning, at about 10:00 a.m., a biologist was at work in a remote wildlife area two miles from Keewayden Island. He ran into three men coming out of the bush. They were wearing stained tee-shirts and shorts, had no camping gear or provisions, and were bug-bitten and scratched. They told him that they had left their boat near Cape Romano, which is 20 miles from the place where they encountered the biologist. Based on his experience the biologist knew that it was not

---

* Honorable John W. Peck, U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

1. 21 U.S.C. § 955a(c).

2. 21 U.S.C. § 955a(a).

possible to travel overnight from Cape Romano to where they were without using a boat.

The three men inquired how they could get out of the area. The biologist offered to take them out. He transported the three to a marine laboratory, where Lavado used the telephone to give directions to a person in Key West, describing how to get to the laboratory, a five hour trip. The biologist informed the director of the laboratory of what had happened, and the sheriff's department was called. Three officers from the sheriff's office arrived. They detained the three men to wait the arrival of customs officials, but they did not place them under formal arrest.

Customs officers arrived after approximately one hour. An officer identified himself to Lavado, gave him *Miranda* warnings, and advised him that he was the subject of an investigation. He requested Lavado identify himself. Lavado brought out his wallet and handed it over. It contained a Coast Guard record showing Lavado as operator of the Yenya, receipts for diesel fuel procured in Barranquilla, Colombia, and Port au Prince, Haiti, and a piece of a navigation chart later identified as matching a larger portion found aboard the Yenya.

### THE COLOMBIANS

■ The evidence concerning Jessie, the tracking dog, was not erroneously admitted. *U.S. v. Joyner*, 492 F.2d 650 (D.C.Cir.), *cert. denied* 419 U.S. 852, 95 S.Ct. 94, 42 L.Ed.2d 83 (1974); *U.S. v. Guerrera*, 554 F.2d 987 (9th Cir.1977). The trainer testified to his own experience in training and using tracking dogs, extending over nearly ten years. He explained the methodology for training and testified to prior experience with Jessie and to her reliability. He

testified that Jessie began tracking at the site where four sets of footprints going in the same direction left a life jacket lying on the beach. Other footprints left the area of the life jacket and went in another direction. The life jacket was identified to him as having been removed from the beached boat (which was no longer there), and as marking the location where the occupants of the boat had left the boat. Another witness placed the beaching point at another location, but the jury could accept the trainer's location as correct.

■ Jessie did not run the Colombians down but sniffed them after they had been arrested. The jury was entitled to accept the trainer's testimony that this was her way of identifying the subject of the track.

■ This case differs from *U.S. v. Rozen*, 600 F.2d 494 (5th Cir.1979). There defendant was charged with possession of and conspiracy to possess marijuana. The only evidence to connect him with the conspiracy, and with a truck found in the woods and carrying marijuana, was a track by bloodhound Clyde, who "cut a tight circle" around the truck, found a scent, and followed it, and some three to four miles away through the woods and some five hours later, found defendant asleep in the woods. We held that the evidence was insufficient to convict because the scent was picked up at an unspecified point near the truck and could not support an inference that defendant had been in the truck or in a position where he could see marijuana within the truck's body. In the present case the nexus between beaching point, jacket from the boat, four sets of prints, four persons arrested and sniffed by Jessie, identification of the four as Colombians, and nexus of the boat to Colombia, sufficiently connected defendants to the scent and to the boat.[3]

**3.** Counsel, having picked up from other cases the scent of how to handle a tracking dog case, followed numerous leads relating to testimony about Jessie's track—Jessie's training, the experience and qualifications of her trainer, prior cases in which she had "testified" through the surrogate voice of her trainer, whether Jessie led the trainer along the scent and the footprints or he led her, whether Jessie was truly a bloodhound or only a mutt (her pedigree not being in

evidence), whether she swam to the boat where she sniffed defendants or was taken to it and hoisted aboard, and whether defendants were entitled to have Jessie present in court. Presumably Jessie was still alive, so she escaped the issue raised in *Rozen*, of whether testimony concerning Clyde, who pending trial had passed away to happier hunting grounds, was barred under principles barring testimony concerning a transaction with a dead dog.

The evidence was sufficient as to the Colombians, bearing in mind their presence on the remote island late at night, that Spanish was heard from the boat, the spontaneous identification of the group by one of them as Colombians, the items on the vessel tending to show that it had been to Colombia, the four-three combination of Colombians and Americans that the jury could infer made up the seven persons from the boat, and the dog trainer's testimony.

The contention of these defendants that it was unduly prejudicial to identify them as "Colombians" is frivolous. One of the group identified them as such, and there was evidence from which the jury could infer that the boat had been to Colombia.

### THE AMERICANS

The three Americans contend they were illegally detained at the marine laboratory by the county officers, so that their subsequent arrests by customs officers approximately an hour later were invalid and evidence obtained from them and statements made by them to customs officers were therefore inadmissible.

The county officers did not have probable cause. The most they knew was that a vessel had been chased and had been seized by the Coast Guard in the vicinity and that three males were at large. But the officers did have reasonable suspicion, based upon the foregoing information, the remoteness of the area, the unlikelihood that three males would be tramping around together lost, clothed as they were, and seeking transportation out of the area.

This was more than a *Terry* investigatory stop. The county officers did not investigate. Rather they detained the defendants for an hour awaiting the arrival of the customs officers. The detention occurred at the border, or the functional equivalent, but was by local officers who had no customs authority. We agree with the Ninth Circuit that a *Terry*-type stop, at the border, by local officers, followed by a brief detention, for the purpose of awaiting the arrival of officers with border-type authority, is valid. *U.S. v. Moore,* 638 F.2d 1171 (9th Cir.1980). The length of time that non-customs officers can maintain the status quo at the border or its functional equivalent, awaiting the arrival of persons with customs authority, must be brief. Bearing in mind the location, the one-hour detention in this case passes muster.

There was no error in introducing the material from Lavado's wallet. After he had been given *Miranda* warnings, he handed over his wallet in response to a request to identify himself. There is no evidence of duress or coercion other than the fact of detention to make his facially voluntary act involuntary.

The contention of the Americans that the evidence as to them was insufficient is frivolous. We do not need to repeat the analysis made above with respect to the Colombians, because the Americans were identified as three of the persons on the boat.

AFFIRMED.