**40**

UNITED STATES of America

v.

Norman DANSKER, Appellant in
No. 75–1685, et al.

Appeal of Joseph DIACO, in No. 75–1686.

Appeal of Stephen HAYMES, in
No. 75–1687.

Appeal of Donald ORENSTEIN, in
No. 75–1688.

Appeal of Nathan L. SEROTA, in
No. 75–1689.

Appeal of Andrew VALENTINE, in
No. 75–1690.

Appeal of VALENTINE ELECTRIC,
in No. 75–1691.

Appeal of INVESTORS FUNDING
CORP. OF NEW YORK, in
No. 75–1692.

Nos. 75–1685 to 75–1692.

United States Court of Appeals,
Third Circuit.

Argued Feb. 4, 1976.

Decided June 2, 1976.

**44**

Donald J. Goldberg, Philadelphia, Pa., for appellant in No. 75–1685.

Frederic C. Ritger, Jr., South Orange, N. J., for appellant in No. 75–1686.

Alan M. Dershowitz, Cambridge, Mass., for appellant in No. 75–1687.

Richard A. Levin, Amster & Levin, Newark, N. J., for appellant in No. 75–1688.

Martin London, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellant in No. 75–1689.

Marilyn J. Morheuser, Kevin J. Walsh, New York City, for American Civil Liberties Union of New Jersey as amicus curiae in No. 75–1689.

Edward Gasthalter, Gasthalter & Pollok, New York City, for appellants in Nos. 75–1690/91.

James B. Smith, Metuchen, N. J., for appellant in No. 75–1692.

Jonathan L. Goldstein, U. S. Atty. for the District of New Jersey, John J. Barry, Asst. U. S. Atty., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and VAN DUSEN and WEIS, Circuit Judges.

OPINION OF THE COURT

SEITZ, Chief Judge.

The defendants Dansker, Haymes, Orenstein, Diaco, Valentine, Valentine Electric, and Investors Funding Corporation were convicted under a three count indictment charging them with conspiracy to violate the Travel Act, 18 U.S.C. § 1952, and with substantive violations of the statute. Count I alleged that they had conspired to utilize the facilities of interstate commerce to bribe Burt Ross, the mayor of Fort Lee, New Jersey, and the defendant Nathan Serota, vice-chairman of the Fort Lee Parking Authority, in order to gain zoning variances and other official approvals which would permit the construction of a large shopping center complex in Fort Lee. The remaining counts of the indictment charged them with the bribe of Ross (Count II) and the bribe of the defendant Serota (Count III). The remaining defendant, Serota, was convicted solely under Count III of the indictment which charged him with accepting a bribe in violation of New Jersey law. The defendants have appealed, alleging numerous infirmities in their convictions.

THE FACTUAL BACKGROUND:

The evidence, viewed in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), may be summarized as follows: Fort Lee, N.J., is a community of approximately 40,000 residents located at the western terminus of the George Washington Bridge. In 1971, Arthur Sutton began acquiring real estate in that community for commercial development. His efforts were financed to a large extent by the defendant Investors Funding Corporation ("IFC").[1] During 1972 and 1973, the financing arrangement between Sutton and IFC was used by the principals of IFC, defendants Dansker, Haymes, and Orenstein (the "IFC defendants"), to divert ap-

---

1. Since IFC could only act through its officers and agents, its criminal responsibility in this matter is predicated solely upon the alleged misconduct of its principals, Dansker, Haymes, and Orenstein.

Hence, a reversal of the convictions of the IFC defendants would inure to the benefit of the corporation. *E. g., United States v. American Radiator & Stand. San. Corp.,* 433 F.2d 174, 204–05 (3d Cir. 1970).

proximately $5,000,000 in IFC funds to their personal use.

Although much of the property acquired by Sutton and IFC was zoned non-commercial, they ultimately decided to build a huge shopping center complex on it. To this end, Sutton petitioned the Fort Lee Board of Adjustment in late 1973 for zoning variances permitting the construction of the project. Plans for the complex were announced publicly in early 1974.

A large segment of Fort Lee's populace reacted strongly to the proposal. One of the leaders of this opposition was the defendant, Nathan Serota, the vice-chairman of the Fort Lee Parking Authority. Serota was a builder on Long Island but resided in an expensive condominium apartment located in Fort Lee near the proposed project complex. Although he took no action in his capacity as a public official, Serota paid for advertisements in local newspapers opposing the project and helped form a citizens group which brought lawsuits against the developers. In addition, he organized and financed a slate of candidates for the Borough Council who made the proposed complex the major issue in the upcoming elections. However, Serota and the project's opponents concentrated their immediate efforts on blocking approval of the developers' petition for variances then pending before the local Board of Adjustment.

Public hearings on Sutton's petition began before the Board of Adjustment in early March 1974. From the outset, Serota, accompanied by counsel, regularly attended the hearings and took an active part in them. By April, it became evident that the project had little chance of gaining the needed variances.

At this point defendant, Andrew Valentine, president of the defendant, Valentine Electric Company,[2] approached Sutton and offered to assist in obtaining official approval for the project in exchange for an opportunity to receive the electrical contract for the complex. At a subsequent meeting between them, Valentine suggested that their problems could be solved by buying off the two major opponents of the project, Serota and Mayor Ross. Sutton then relayed this proposal to the IFC defendants who approved such an approach and agreed to finance it.

In the weeks that followed, Serota was contacted by Valentine. They worked out an agreement under which Serota would sell his Fort Lee apartment, valued at $500,000, to the developers for $900,000. In addition, Serota would agree to cease his opposition to the project and take active steps to secure its approval in a modified form. Serota was to also receive an additional $200,000 in cash on the date his apartment was sold.

The actual sale of Serota's apartment was consummated on May 15. Under the terms of the contract, Serota sold his apartment for $900,000 ($250,000 down, $650,000 in deferred payments) to Herman Lasker, defendant Orenstein's brother-in-law, as agent for an undisclosed principal. The purchaser agreed to sublease the apartment back to Serota rent-free until September 30, 1978. The contract also contained a provision stating that Serota agreed to halt his opposition to the project. However, no mention at all was made of Serota's agreement to assist in obtaining official approval for the project or the additional $200,000 in cash he received on the closing date.

Having "taken care" of Serota, the defendants turned their attention to Mayor Ross. On May 19, a meeting took place between Ross and the defendant Joseph Diaco, a principal of Valentine Electric, at which Diaco sought to have Ross postpone the Board of Adjustment's decision on Sutton's petition which was then scheduled for May 22. When Ross indicated that he could not, Diaco asked him, "Would money help?". The meeting closed with Ross' agreement to meet with the developers' attorneys, but only after the Board of Adjustment rendered its decision. Ross secretly reported

---

**2.** Valentine Electric Company's criminal responsibility in this matter is also predicated upon the alleged misconduct of its principals, the defendants Valentine and Diaco. Consequently, a reversal of the convictions of those defendants would inure to its benefit.

the incident to the United States Attorney's Office the following day, and thereafter worked with it in its investigation of the matter.

On May 22, Ross met with Diaco once again and had several telephone conversations with him. Diaco continually urged him to delay the Board's decision scheduled for that evening. This time, however, he offered him first $200,000, then $400,000, and finally $500,000 for his cooperation. During the last phone conversation of the day, which was taped, Diaco repeated his $500,000 bribery offer and threatened to expose "something about [Ross'] administration" if he refused to go along. Ross, however, would only agree to meet with the defendants' attorneys after the variances had been turned down.

As expected, without Ross' intervention the Board voted down Sutton's petition. An outright rejection carried with it dire financial consequences for IFC which was then heavily indebted to several New York banks. Consequently, in order to placate IFC's creditors, Sutton and the IFC defendants decided to submit a modified version of the project to the Board in the near future. It was imperative that this modified proposal quickly receive official sanction. To this end, Valentine was again enlisted to attempt to secure Ross' assistance.

On May 24, Ross, wearing a body recorder provided by the FBI, met with Diaco in a Hackensack, N.J. restaurant. They discussed the means by which approval of the project in its revised form could be obtained. For his assistance, Ross was offered $100,000 as an advance to evidence Diaco's good faith, with an additional $200,000 to $400,000 to be forthcoming. Ross feigned acceptance of the proposal and agreed to meet further with Diaco and Sutton.

Ross' meeting with Diaco and Sutton took place on May 26, in a Paramus, N.J. diner. Ross was again equipped with a body recorder. The three discussed in detail the modified version of the project. Sutton stated that approval of it was needed by June 17. They then turned to the subject of the bribe. Ross indicated that he did not believe that $100,000 was overly generous. However, he accepted $100,000 in cash from Diaco. Later that day, he delivered this money to the FBI.

By May 29, IFC was under heavy pressure from the New York banks holding its notes. In order to avoid financial disaster a definite date on which the modified proposal would be placed on the Board's agenda was needed. Consequently, the IFC defendants contacted Sutton and urged him to finalize arrangements.

The following day, Ross, Sutton, and Diaco met once again. The three agreed that the revised plan would be submitted to the Board on June 7. It was hoped that official approval could then be obtained within ten days. For his part in the scheme, Ross would receive $200,000 in cash when the Board approved the plan and an additional $200,000 in monthly installments of $25,000. This proved to be the final clandestine meeting between Ross and any of the defendants for on May 31, the initial indictments in this prosecution were handed down.

Originally, Sutton and Diaco were indicted for conspiracy to bribe Mayor Ross. This first indictment was dismissed with leave of the court after Sutton was permitted to plead guilty to a lesser offense in exchange for his agreement to furnish evidence on behalf of the government. Thereafter, a second indictment was handed down against all the defendants in the instant appeal. This second indictment was superseded by a third which charged the defendants with the identical crimes, but contained additional allegations and corrected arguable defects in the second. The defendants appeal from their convictions under this third indictment.

ISSUES ON APPEAL:

I. *Attack on Count III*

A. *Serota's Appeal*

Defendant Serota has raised numerous challenges to his conviction under Count III, the principal of which is that his conduct failed to violate the Travel Act, 18

U.S.C. § 1952. The Travel Act makes it a federal offense for an individual to utilize the facilities of interstate commerce with the intent "to further any unlawful activity". It goes on to define "unlawful activity" as the crimes of "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States". Serota was charged with violating this federal statute by accepting a bribe in violation of the laws of New Jersey. He vigorously asserts, however, that the actions charged and proven against him fail to constitute bribery under any definition of the crime.

At the outset we note that the Travel Act incorporates into federal law New Jersey's substantive law of bribery for this particular case, even though it contains a more expansive definition of the crime than that found at common law. The Travel Act does not reach only those state offenses which would have constituted the crimes of "extortion, bribery, or arson" at common law. Rather, all state offenses which can be generically classified under those headings fall within its purview. *United States v. Nardello,* 393 U.S. 286, 89 S.Ct. 534, 21 L.Ed.2d 487 (1968).

This broad interpretation of the Act has enabled it to encompass state statutory expansions of the crimes of extortion, bribery and arson over the years, and thus more effectively carry out its purpose of aiding local law enforcement efforts to combat "pernicious undertakings which cross state lines." Hence, in *Nardello,* the Supreme Court held that the defendant's "shakedown" operation could constitute extortion within the meaning of the Travel Act even though a private citizen could not commit the crime of extortion at common law and the particular state involved classified the defendant's activities as blackmail.

As will become evident in our discussion of New Jersey law, the conduct prohibited by the relevant New Jersey bribery statute easily comes within the generic term bribery. Consequently, we will analyze Serota's activities in terms of New Jersey law in determining whether they violated the Travel Act.

In maintaining that his conduct failed to constitute the acceptance of a bribe, Serota raises two main arguments. First, he contends that it was neither charged nor proven that the alleged bribers paid him any monies because of his status as vice-chairman of the Fort Lee Parking Authority. In this regard, he points out that there is no record evidence indicating that the influence he agreed to exert on behalf of the developers derived in any way from his official position or that the alleged bribers believed that he could influence public decisions concerning the project by virtue of his public office. Secondly, he asserts that the government made no effort to establish that he was to act in a manner other than that permissible for any private citizen in attempting to influence official actions with respect to the project.

The government contends, however, that Serota's arguments are immaterial under its construction of the relevant New Jersey law. That law does not require that a public official agree to be influenced in connection with his official duties. Indeed, the recipient need not be a public official at all. Rather, the government maintains, the crime is made out whenever the recipient agrees to accept payment with the "corrupt intent" to influence any official action whatsoever.

Although arguing that any individual may be guilty of accepting a bribe under New Jersey law, the government asserts that the requisite corrupt intent is much easier to establish when a public official is the recipient. Since a public official is bound by rules of honesty and integrity far more stringent than those imposed on private citizens, it argues that it need only be shown that a public official accepts a personal benefit in exchange for his agreement to influence any official action, whether in a lawful manner or not.

Under its interpretation of the relevant New Jersey law, the government insists that the evidence below is sufficient to sustain Serota's conviction. It is undisputed

that Serota was a public official who accepted monies from the developers. The evidence justified a finding that, in exchange for this payment, he agreed not only to halt his opposition to the project, but also to take affirmative steps to secure official approval for it in a modified form. In this latter respect, the record indicates: (a) that Serota agreed to issue a public statement favoring the modified project's construction; (b) that he changed his stance at the Board of Adjustment's hearings from one opposing the project to one supporting it in a reduced format; (c) that shortly after the sale of his apartment, he told Valentine, "We can take care of the hearings. We'll cooperate with you"; and (d) that he agreed to speak to his slate of candidates in order to induce them to support a limited project and, if ultimately elected, to assist in obtaining official approval for it. The government concludes that an agreement by a public official to influence governmental action in this manner in exchange for money establishes his "corrupt intent" and thus violates New Jersey's law of bribery.

The pertinent New Jersey statute provides as follows:

N.J.S.A. 2A:93–6

Any person who directly or indirectly gives or receives, offers to give or receive, or promises to give or receive any money, real estate, service or thing of value as a bribe, present or reward to obtain, secure or procure any work, service, license, permission, approval or disapproval, or any other act or thing connected with or appertaining to any office or department of the government of the state or of any county, municipality or other political subdivision thereof, or of any public authority, is guilty of a misdemeanor.

Certainly, on its face, it would appear to encompass Serota's conduct. It does not require that the recipient of a bribe be a public official, or if a public official, that he agree to be influenced with respect to his official duties. Nor does it require that the recipient somehow attempt to influence governmental action in an unlawful or oth-

erwise corrupt manner. Rather, the statute, by its terms, makes it unlawful for any individual to accept any benefit in exchange for his agreement to influence any official action in any manner.

Obviously, the statute cannot be read in such a literal fashion without running afoul of the first amendment. The government implicitly concedes this point by attempting to engraft a "corrupt intent" element onto it. Consequently, we must resort to the relevant New Jersey case law in order to obtain the proper construction of the statute.

Our analysis of the most recent New Jersey cases construing the statute indicates that it was designed to reach only that conduct which has been the traditional concern of the law of bribery—conduct which is intended, at least by the alleged briber, as an assault on the integrity of a public office or an official action. The only expansion of the common law crime seemingly effected by the statute is that any individual may be convicted of accepting a bribe if he in fact possesses, or creates the appearance that he possesses, the ability to influence official conduct. In expanding the law's ambit to include both actual and would-be brokers of governmental corruption, the New Jersey legislature apparently intended to deter all individuals willing to purchase such governmental influence, and thus better insulate public actions from corruption. *See State v. Ferro,* 128 N.J.Super. 353, 320 A.2d 177 (App.Div.), *cert. denied,* 65 N.J. 566, 325 A.2d 700 (1974). However, whether the recipient is a public official or a private citizen, the gravamen of the offense remains the same. The recipient must agree to utilize whatever apparent influence he might possess to somehow corrupt a public office or an official act.

A close examination of both cases relied on by the government for its broad interpretation of the statute supports our more narrow construction. In *State v. Sherwin,* 127 N.J.Super. 370, 317 A.2d 414 (App.Div.), *cert. denied,* 65 N.J. 569, 325 A.2d 703, *cert. dismissed,* 419 U.S. 801, 95 S.Ct. 9, 42 L.Ed.2d 32 (1974), the defendant, New Jer-

sey's Secretary of State, was convicted of accepting a bribe under the statute in question. He had urged the state's Commissioner of Transportation to reject the low bid on a highway contract in favor of that submitted by a contractor who had enlisted his aid by contributing $10,000 to his political party. On appeal, the defendant argued, among other things, that he could not be found to have violated the statute without a showing that he possessed the official authority to effect the governmental action sought.

In affirming his conviction, the court found it immaterial that he lacked such official authority. However, the court did not base its decision on the mere fact that the defendant was a public official as the government seems to suggest. Rather, the court found that the defendant had violated the statute because he had used the "opportunity . . . to perform a public duty as a means of acquiring an unlawful benefit". 317 A.2d at 422. Obviously, the "public duty" referred to was that of the Department of Transportation, since the defendant possessed none with respect to the highway contract involved. Hence, liability was predicated on the fact that the defendant, in exchange for favors, had agreed to utilize whatever apparent influence [3] he might possess to undermine the integrity of the decisionmaking processes of that governmental body.

That the essence of the offense remains an agreement to corrupt a public office or action is even more evident in *State v. Ferro, supra.* There, the defendant was the local leader of the Democratic Party but held no public office. He was convicted of accepting a bribe upon a showing that he had accepted money from two defendants in pending state criminal prosecutions in exchange for his agreement to use his influence in order to secure for them favorable treatment from the local probation office and state courts. In affirming his conviction, the court rejected his argument that N.J.S.A. 2A:93–6 did not reach the activi-

ties of private citizens. Rather, the court found that the statute was aimed at both actual and would-be brokers of governmental corruption, and that, as a result, any individual could be guilty of accepting a bribe so long as he created an understanding with the briber that "he [could] influence matters in connection with an official duty." 320 A.2d at 179. As the court went on to state:

"The most reasonable interpretation of this provision is that it was designed to broaden the offense of bribery so as to include the peddling of influence by a person in an apparent position of access to a public official. Such activity is not penalized by the common law. *Yet, being a common evil which denigrates the integrity of our public institutions, the Legislature undoubtedly intended to proscribe such conduct.*" (emphasis added). 320 A.2d at 180.

■ Our construction of the pertinent New Jersey bribery statute, then, differs greatly from that pressed upon us by the government. The statute does not make criminal an agreement by a public official to influence, in an otherwise lawful manner, governmental action unrelated to his office because, in entering such an agreement, he violates some nebulous standard of propriety imposed on public officials by law. Rather, in order to establish a violation of the statute, it must be demonstrated: (a) that the alleged recipient, whether he be a public official or not, possessed at least the apparent ability to influence the particular public action involved; and (b) that he agreed to exert that influence in a manner which would undermine the integrity of that public action.

In view of the government's erroneous interpretation of the relevant law, it is not surprising that the evidence adduced below, even when viewed in the light most favorable to the government, is insufficient to sustain a conviction under the statute, properly construed. With respect to the first factor noted above, although it is clear that

---

**3.** Moreover, that he possessed influence in this matter is evident from the fact that the Com-

missioner initially acceded to his request and rejected the low bid. 317 A.2d at 417–18.

Serota was a public official, the government failed to produce any evidence whatsoever indicating that he had any ability, actual or apparent, to influence official decisions concerning the project in his official capacity, or that the alleged bribers believed he could do so by virtue of his public office. Indeed, on the record before us, it is not even clear that the developers were aware of the fact that Serota was the vice-chairman of the Fort Lee Parking Authority. Hence, on the facts of this case Serota's status as a public official, a factor crucial to the government's theory of criminality,[4] really has no bearing on the issue of whether Serota's activities violated the particular statute involved.

Moreover, an examination of the record fails to disclose any evidence suggesting that Serota had any access to the Board of Adjustment in some unofficial capacity which the developers were interested in purchasing. Rather, the only influence, discernible from the record, which Serota possessed in these matters was that derived from his activities as a private citizen vocally opposing the project's development. And, a fair reading of the record indicates that it was in this capacity as "the leader of the . . . biggest portion of the opposition" that he was approached by the developers.

Turning to the second prong of our analysis, we agree that the evidence introduced by the government conclusively establishes that Serota agreed to halt his previous opposition to the project and publicly exert his considerable influence in the developers' behalf. However, even though the evidence demonstrates that he agreed to take "affirmative" steps to secure official approval for the project in a modified form, without more, it fails to justify a finding that, in so doing, he was to engage in any conduct that would corrupt the activities of the Board of Adjustment. Certainly, his public reversal of his prior stance against the project, even if motivated by financial considerations, could not subvert the integrity of that governmental body. Nor would his efforts to induce his slate of candidates to endorse a limited project since they obviously possessed no authority whatsoever in these matters prior to their election.

The only remaining piece of evidence relied on by the government—Serota's statement to the effect that he would "take care" of the hearings by cooperating with the developers—fails to raise an inference of criminality when viewed in the context of the entire record. As previously noted, there was no record evidence suggesting that Serota could influence the Board of Adjustment in any manner other than by ceasing his opposition to the project and publicly supporting its construction. Hence, against this background, Serota's statement can only be reasonably interpreted as his agreement to take a stance in favor of the project before the Board. *See United States v. Cades*, 495 F.2d 1166, 1169–70 (3d Cir. 1974); *United States v. Finnerty*, 470 F.2d 78, 81 (3d Cir. 1972). Moreover, even if this single statement could support some inference of illegality, we would find it insufficient to justify Serota's conviction, especially in view of the government's burden of proof and the possible infringement of Serota's first amendment rights to freedom of speech.

■ We therefore find that the evidence below establishes nothing more than Serota's agreement, in exchange for money, to withhold his prior opposition to the project and publicly advocate its construction in a reduced form. While Serota's motives in entering an agreement of this nature are hardly commendable, there is no suggestion that he agreed to corruptly influence the Board of Adjustment. Accordingly, we

---

4. Indeed, the government seemed to rely entirely on this factor as evidenced by the prosecutor's following statement:

"He [counsel for Serota] suggests, for example, if Mr. Serota had been another member of the Fort Lee Aroused Citizens and had not been vice chairman of the Parking Commis-sion of Fort Lee perhaps no crime would have been committed and perhaps he is right, but the star[k] fact here is that Mr. Serota is in fact a public official. As such, the law imposes upon him obligations that it does not impose on private citizens."

hold that the government failed to prove that Serota violated the statute in question. His conviction under Count III will therefore be reversed.

### B. *Appeal of the Remaining Defendants*

■ What we have said concerning the sufficiency of the evidence under Count III with respect to Serota also holds true for his alleged bribers, the remaining defendants in this case. In order for that evidence to sustain their convictions for bribing Serota, it must demonstrate, at a minimum, that, in purchasing his support, they intended to corrupt the decision-making processes of the Board of Adjustment, the governmental entity he was to influence. Evidence of this nature, however, is totally absent on the record before us. Rather, the evidence, taken in its entirety, establishes only their intent to silence Serota's vocal opposition and enlist his public support through their payments to him. Reprehensible as this may be, it simply fails to violate New Jersey's law of bribery. Consequently, their convictions under Count III must also be reversed.

### II. *Issues Raised Jointly by the Defendants Under Counts I and II:*

Before turning to the alleged errors of the trial court, we will first consider the defendants' contention that their convictions under Counts I and II must also be reversed, if, as we have already determined, the evidence under Count III was insufficient to support their convictions for bribing Serota.

With respect to Count I, the defendants argue that in view of our decision on Count III, it is no longer possible to determine whether they were convicted of a conspiracy properly charged and proven. Count I alleged that the defendants had conspired to bribe Ross and Serota. The district court, however, instructed the jury that if it found that the alleged conspiracy had as its illegal objective *either* the bribe of Ross or Serota it could convict the defendants. The conspiracy count was thus submitted to the

jury on alternative theories, only one of which, in retrospect, was sufficient to justify a conviction. The jury then rendered a general verdict of guilty on Count I making it impossible to identify the grounds on which its decision was based. Consequently, the defendants assert that their convictions may have rested solely on a finding that they had conspired to bribe Serota and must, therefore, be reversed.

In response, the government maintains that any lingering doubts as to the basis of the jury's verdict on Count I are dispelled by its decision on Count II. Since the jury there found the defendants guilty of jointly bribing Mayor Ross, the government insists that it must have also determined that the Ross bribe was at least one of the conspiracy's objectives. The government therefore concludes that the validity of the conspiracy convictions are in no wise jeopardized by our decision with respect to Count III.

■ We cannot agree. The government's position ignores the fact that the crime of conspiracy is separate and distinct from the related substantive offense. It requires proof of the additional element of an agreement between the alleged co-conspirators. *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v. Pappas,* 445 F.2d 1194 (3d Cir. 1971). Hence, it is neither illogical nor impossible for a jury to find an alleged conspiracy nonexistent while, at the same time, convicting the defendants of the substantive offenses charged.

■ In the instant case, the possibility thus remains, albeit slim, that the jury found that the defendants engaged in a conspiracy to bribe Serota alone in spite of its guilty verdict on Count II. As a result, the defendants' conspiracy convictions must be vacated and this case remanded to the district court for a new trial unless it determines that Count I, in its present form, is fatally defective in light of the conclusions reached herein.

■ As to their convictions under Count II for bribing Mayor Ross, the defendants

argue that the improper submission to the jury of Count III and the evidence relating thereto so infected their convictions that a new trial is warranted. In this regard, the defendants do not suggest that the evidence below was insufficient without that of the Serota bribe to support the jury's verdict on Count II. Rather, they contend that they were unduly and improperly prejudiced on Count II by the jury's consideration of the purported Serota bribe and its finding of guilt thereon.

Although the district court did err in submitting Count III to the jury, we do not believe that its error so tainted the jury's deliberations on Count II that a reversal of the defendants' convictions for bribing Mayor Ross is in order. The evidence concerning the two bribes was of such a nature that it could be easily compartmentalized by the jury and then considered independently by it under each separate count of the indictment. For example, the two bribes were entirely different in form. Serota received the bulk of his payments under the guise of a contract of sale for his apartment. Ross, on the other hand, was surreptitiously paid by the defendants. Moreover, the two bribes were separated in time. Ross was not even contacted by the defendants until after Serota's assistance had been secured. Consequently, we believe that there was little possibility that the jury relied on improper evidence in reaching its guilty verdict on Count II.

In any event, nearly all of the evidence concerning the defendants' dealings with Serota would have been admissible even if Count III had not been included in the indictment. The Serota transaction was an integral part of the defendants' scheme to obtain the variances needed for their project. Hence, evidence concerning it was clearly relevant to show the defendants' motive in approaching Ross with their proposition as well as their modus operandi. Any prejudice suffered by the defendants from the balance of this evidence was minimal and certainly does not entitle them to a new trial.

In the remainder of our opinion we will determine whether their convictions under Count II of the indictment can stand in light of their further assignments of error.

### A. *Recusal*

Prior to trial, the defendants Diaco, Valentine, and Valentine Electric filed timely motions pursuant to 28 U.S.C. § 144 seeking to have the district judge disqualify himself on the ground that he was personally biased against them.[5] Each such motion was accompanied by the required affidavit of bias from the movant as well as a certificate of good faith from his counsel of record. The trial judge, however, refused to recuse himself holding that the allegations contained in the affidavits were not sufficient to establish the requisite personal bias on his

---

**5.** Three months after the initial indictment in this prosecution was handed down, Diaco moved for the district judge's recusal. At the hearing on this motion, questions arose as to the timeliness of Diaco's motion and the good faith of his attorney's certificate. As a result of this latter issue, Diaco's attorney stipulated to additional facts not contained in his client's affidavit of bias. Thereafter, while indicating that the motion was not timely and subject to dismissal on that ground, the district judge denied the motion as being legally insufficient.

When the first indictment was later dismissed and superseded by the second, Diaco once again moved for the trial judge's disqualification on the basis of a new affidavit which contained the additional allegations previously omitted, but stipulated to by his counsel. Valentine and Valentine Electric also moved for recusal at this time and filed an affidavit essen-

tially adopting all the allegations contained in that of Diaco. These motions were then denied as being legally insufficient.

After the third indictment, under which defendants were ultimately convicted, was returned, Diaco again moved for recusal on the basis of the papers previously filed by him. Although Valentine and Valentine Electric failed to file a formal motion in this regard, the trial judge treated their earlier motion as having been renewed, and then denied all the motions seeking his disqualification.

In the instant appeal, then, we need only consider the legal sufficiency of the affidavits before the trial judge when he denied the motions for his recusal under the third indictment. Any claims as to the propriety of his actions at the hearing on the first motion for recusal have been rendered moot by the subsequent dismissal of the first and second indictments.

part. On appeal, the defendants contend that he erred in so doing.[6]

The affidavits of bias submitted by Diaco and Valentine may be summarized. Diaco and Valentine are identified as principals of Valentine Electric since its formation in 1958. The affidavits then go on to allege that between 1969–71 the trial judge, while serving as United States Attorney for the District of New Jersey, repeatedly and publicly singled out Valentine Electric as having underworld connections; that he invited competitors of Valentine Electric to bring any complaints against it to the attention of his office; and that he conducted vigorous investigations of the company's affairs. These investigations were highlighted by his office's 1970 prosecution of, among others, Anthony Boiardo, then owner of one third of Valentine Electric's stock and widely reputed to be an underworld figure, and Joseph Biancone, a Valentine employee, for acts of extortion both on and off the premises of the company. In addition, Diaco alleged that he himself had been called before a federal grand jury on two separate occasions and questioned about his relationship with Boiardo and the manner in which Valentine Electric obtained its contracts.

Both Diaco and Valentine, however, make a number of significant concessions in their affidavits. They concede that the district judge's statements were primarily directed against Boiardo who was generally regarded as the controlling figure in Valentine Electric and that Boiardo severed all connections with the company in 1970. Moreover, they admit that after Boiardo disassociated himself from the company and while the trial judge was still United States Attorney, a representative of his office informally advised a law firm, which was considering Valentine Electric as a potential client, that there was no longer any basis for believing that its principals were engaged in criminal activity.

The affiants insist, however, that these latter allegations demonstrate only a lack of criminal evidence, rather than a lack of prejudice against them. Hence, based on their allegations in their entirety, they conclude that the court was personally biased against Valentine Electric and against them because of their intimate connection with that company.

 The basic rules of law governing the recusal of a trial judge for personal bias are well-settled. The mere filing of an affidavit of bias pursuant to 28 U.S.C. § 144 does not require a trial judge to disqualify himself from a particular case. *Behr v. Mine Safety Appliances Co.,* 233 F.2d 371 (3d Cir. 1956). Indeed, if the affidavit submitted is legally insufficient to compel his disqualification, the judge has a duty to preside. *See Simmons v. United States,* 302 F.2d 71 (3d Cir. 1962). Rather, a trial judge need only recuse himself if he determines that the facts alleged in the affidavit, taken as true, are such that they would convince a reasonable man that he harbored a personal, as opposed to a judicial, bias against the movant. *United States v. Thompson,* 483 F.2d 527 (3d Cir. 1973).

 After analyzing the defendants' affidavits under this standard, we are unable to say that the trial judge erred in refusing to disqualify himself. Neither Valentine nor Diaco make a single allegation indicating that the district judge ever manifested, by word or deed, any hostility, animosity, or, for that matter, any emotion whatsoever towards them personally. Rather, Diaco and Valentine base their belief that the district court could not preside at their trial in a fair and impartial manner entirely on his prior investigation of, and statements concerning, Valentine Electric and his prosecution of Boiardo and Biancone. However, allegations that the trial judge, during the course of his duties as United States Attorney, investigated, commented upon, and prosecuted some of the former princi-

---

**6.** The defendants other than Diaco, Valentine and Valentine Electric also assert that the district judge's refusal to recuse himself constitutes reversible error as to them even though they refused to join in such motions below. Their assertion does not constitute compliance with the statute. See 28 U.S.C. § 144.

pals of a company with which the defendants are connected do not, without more, establish that he was personally biased toward them as required by the statute. If anything, allegations of this nature merely evidence "an *impersonal* prejudice, [going] to the judge's background and associations *rather than his appraisal of the [movants] personally.*" *Parker Precision Products Co. v. Metropolitan Life Insurance Co.,* 407 F.2d 1070, 1077–78 (3d Cir. 1969) (emphasis added).

The status of Valentine Electric raises a somewhat more difficult problem in light of the fact that the district judge both investigated it and made derogatory comments concerning it while serving as United States Attorney. However, while it is certainly conceivable that an individual may be prejudiced against a corporation such as General Motors which has attained an identity that transcends the personalities of those involved in its management, we do not read the affidavits before us to suggest that the trial judge harbored any such bias towards Valentine Electric in the abstract. Rather, we think that his alleged words and deeds evidence nothing more than hostility toward Anthony Boiardo, the individual then reputed to be in control of the company. Indeed, the affiants themselves seem to acknowledge this when they state that they:

"under[stood] that those statements were directed basically toward Mr. Boiardo who stood in the public eye according to [the trial judge] as the one who had infiltrated and controlled Valentine Electric."

The affidavits further allege, however, that Boiardo severed all connections with Valentine Electric in 1970, and that, thereafter, the United States Attorney's Office, under the trial judge's direction, advised a law firm that there was no longer any reason to believe that the company was engaged in criminal activity. Consequently, we believe that the affidavits do not establish a more substantial basis for recusal with respect to Valentine Electric, than they do for either Diaco or Valentine, its principals and sole remaining stockholders.

We therefore hold that the affidavits submitted by the defendants under § 144 fail to allege the requisite personal bias on the part of the trial judge, and that he committed no error in presiding at their trial. In reaching this conclusion, we emphasize that we have confined our analysis to the legal sufficiency of the defendants' affidavits of bias under § 144.

### B. *Jury Selection:*

The defendants next challenge the procedures utilized by the district court in selecting the jury. Prior to trial, the defendants filed motions seeking a change of venue or vicinage, severance, and a dismissal of the indictment because of the extensive and allegedly prejudicial publicity given their case in the Newark, New Jersey area. Rather than moving the trial from Newark, the district court, pointing to an apparent absence of such publicity in the Trenton, New Jersey area, decided to select the jury from that vicinage, and, thereafter, sequester it during the trial in Newark. The court itself conducted the *voir dire* of the veniremen. In addition, in order to expedite the selection process so that the advantages secured by selecting the jury in Trenton would not be lost, it questioned the potential jurors, for the most part, as a group. Proceeding in this manner, the court succeeded in empaneling a jury in a single day.

While acknowledging that Rule 24, Fed. R.Crim.Proc., grants the district court considerable leeway as to the manner in which it conducts *voir dire,* the defendants contend that the selection procedure here adopted by the court was unfair. More specifically, they claim that the district court abused its discretion by (1) failing to examine each prospective juror individually as to his or her exposure to prejudicial pre-trial publicity; and (2) failing to explore adequately potential areas of juror bias to which the defendants had directed its attention. It should be noted, however, that the defendants do not contest the final composition of the jury selected.

On the issue of pre-trial publicity, the defendants argue that where, as here, extensive pre-trial publicity has been given a case, our decision in *United States v. Addonizio,* 451 F.2d 49 (3d Cir. 1972), requires a district court to examine each prospective juror individually and outside the presence of the entire panel on the question of his or her exposure to such publicity. They contend that the district court's failure to conduct such an individualized examination under the circumstances of the instant case constitutes reversible error.

We disagree. In *Addonizio,* we recommended that a district court follow such a procedure only when, in its opinion, there existed a "significant possibility" that individual talesmen would be ineligible to serve because of their exposure to potentially prejudicial pre-trial publicity. Only by such an individualized examination, we reasoned, could the effects of such exposure on the juror's attitudes toward the impending trial be determined. However, even though the district court failed to follow our recommendations below, it did take measures to screen-out potential jurors who had been exposed to such publicity. Under the facts present here, those measures proved more than adequate to protect the defendants' interests in obtaining a jury unswayed by the publicity surrounding the case.

In the first place, the court wisely decided to select the jury from an area where pre-trial publicity concerning the case had been minimal. This alone significantly lessened the possibility that any of the prospective jurors would have had any pre-conceived notions about the trial.

Secondly, and more importantly, the defendants were in no way prejudiced by the end-result of the selection procedures utilized by the district court. At the outset of *voir dire,* the court asked the entire panel of 217 jurors whether any of them had read or heard anything about the case. Eighteen jurors responded affirmatively. These eighteen were then asked whether, as a result of what they had read or heard, they had formed an opinion as to the guilt or innocence of any of the defendants. Twelve of the eighteen indicated that they had done so and were excused *sua sponte* by the court. The remaining six were then examined by the court as to their exposure to pre-trial publicity and they indicated that, despite such exposure, they could try the case in a fair and impartial manner.

Following the examination of the entire panel, groups of twenty-four prospective jurors were seated in the jury box and questioned by the court. The court once again asked each group whether any of its members had read or heard anything concerning the case. No jurors responded affirmatively other than the unexcused jurors who had previously done so. Of those six jurors, four were eventually excused for other reasons [7] and the remaining two were not seated. Hence, the court succeeded in empaneling a jury composed of individuals who had previously read or heard nothing about the case.

Under these circumstances, the defendants have little cause to complain over the district court's failure to conduct the individualized examination we recommended in *Addonizio.* That procedure is designed to enable both court and counsel to discern whether a venireman's prior exposure to publicity concerning the case would preclude him from sitting as a fair and impartial juror. However, here, every juror who indicated any exposure whatsoever was eventually excluded from the panel. This factor alone distinguishes this case from *Addonizio* where nine of the twelve jurors empaneled had read or heard something about the case prior to trial. Since none of the jurors selected below had been subjected to any publicity concerning the case, the defendants were not exposed to the particular danger the *Addonizio* procedure is designed to guard against.

We therefore find no error in the district court's failure to conduct an individualized

---

**7.** It should be noted that these jurors were excused without the exercise of peremptory challenges by the defendants.

examination of prospective jurors as to their exposure to pre-trial publicity. Moreover, even if we were to find error, under the circumstances existing here, it would certainly be harmless and in no way entitle defendants to a new trial.

We turn next to the district court's alleged failure to explore adequately potential areas of juror bias. The defendants essentially make two arguments in this regard. First, they cite as error the district court's refusal to ask the prospective jurors all questions submitted by them directed at exposing such bias. Second, they assert that the prospective jurors should have been examined individually as to potential bias on their part. We will consider these arguments in order.

Prior to the selection of the jury, the defendants jointly submitted proposed questions aimed at discovering a juror's attitudes in three areas, which, they claim, had a direct bearing on the merits of the case. Those areas were the wealth of the defendants, politicians and money, and the fact that Serota had, in a sense, "sold out" those opposing the project's construction. The defendants maintain that the district court's refusal to ask these questions, or anything similar to them, made it impossible to discover whether such prejudices existed, and if so, to excise them from the trial.

At the outset we note that the latter two areas of potential bias primarily concern Serota and the defendants concede as much in their briefs. Consequently, the remaining defendants have little cause to complain about the district court's alleged failure to ask questions directed at those areas.

■■■ We need not, however, rely on this factor in reaching our decision. As already noted, Rule 24 F.R.Crim.Proc., grants the district court broad discretion as to the manner in which it conducts *voir dire,* subject only to the essential demands of fairness. This discretion certainly includes the decision as to what questions should be asked when the court itself decides to examine the prospective jurors so

long as inquiries relevant to the discovery of actual bias are not omitted. *See United States v. Wooton,* 518 F.2d 943 (3d Cir. 1975). Consequently, although Rule 24 does allow counsel to submit proposed questions to the court, it does not assure him that those questions will be asked.

■■■ Our examination of both the questions asked the panel and the instructions given it indicates that, despite defendants' argument to the contrary, the district court did cover, in substance, all the areas which the defendants wished to explore. Hence, this is not a case where the court entirely omitted inquiries relevant to the discovery of actual bias. *See United States v. Napoleone,* 349 F.2d 350 (3d Cir. 1965). Moreover, in some instances, the questions and instructions of the court were even more specific, and, as a result, more probing, than those requested by the defendants. Under these circumstances, we find no abuse of discretion in the district court's failure to pose to the jury all proposed questions submitted by the defendants.

Whether or not the district court erred in refusing to conduct an individual *voir dire* as to potential juror prejudice raises a somewhat more serious problem. For obvious reasons, an individualized examination is the most effective manner by which to discover latent prejudices on the part of a particular juror. Indeed, under certain circumstances, it may be the only means of assuring a defendant his right to an impartial jury.

At the same time, however, it is an extremely time consuming process which, when unnecessary, must be foregone in the interests of judicial economy. It is for just such reasons that Rule 24 grants the district courts such wide latitude in these matters. It leaves to their sound discretion the duty to forge a reasonable accommodation between the interests in obtaining an unbiased jury, and in doing so as expeditiously as possible. *Judicial Conference Committee On The Operation of the Jury System, The Jury System In The Federal Courts,* 26 F.R.D. 409, 465–66.

On the record before us, we are unable to say that the balance struck by the district court constituted an abuse of that discretion. In the instant case, the need to empanel the jury as quickly as possible was particularly acute. Apart from the normal considerations of judicial economy, an expeditious selection also served the defendants' interests in obtaining an unbiased jury. Prejudicial pre-trial publicity had already forced the court to select the jury from the Trenton, rather than the Newark, area. A long, drawn-out *voir dire* would have allowed potential jurors to be subjected to the inevitable publicity in the Trenton area engendered by the selection there, and thus defeated the purpose of the move. Hence, an expeditious selection was the best available method of insulating prospective jurors from exposure to such publicity.

██ Nor can we say that the procedure followed by the district court unduly restricted *voir dire* so as to deny the defendants their right to an impartial jury. None of the potential areas of bias cited by the defendants were so serious or pervasive that anything short of an individual *voir dire* would have failed to ferret them out. *Cf., United States v. Starks,* 515 F.2d 112 (3d Cir. 1975). In sum, we are convinced upon a review of the record that the *voir dire* was effective in obtaining an unbiased jury. We therefore find no error in the district court's refusal to conduct an individual *voir dire* as to potential juror bias.

### C. *Evidence of Prior Crimes:*

Both prior to and at the trial itself, the defendants vigorously opposed the introduction into evidence of testimony by the unindicted co-conspirator Sutton concerning the previous embezzlement of IFC funds by Dansker, Haymes, and Orenstein, the IFC defendants, on the grounds that it constituted inadmissible evidence of prior crimes.[8] The district court overruled these objections and permitted Sutton to testify on these matters. However, it instructed the jury that this evidence was only to be considered against the IFC defendants and for the limited purpose of determining what, if any, relationship existed between them and Sutton.[9] On appeal, the defendants renew their objections to the admission of this evidence contending (a) that it was irrelevant for any purpose other than to establish a propensity to commit crimes on the part of the IFC defendants; and (b) that even if relevant for some legitimate purpose, its probative value was far outweighed by its prejudicial impact.

In substance, Sutton testified that the IFC defendants had utilized the financing agreement which required IFC to provide him with the funds needed to purchase properties for the Fort Lee project to divert more than $5,000,000 in IFC funds to their own use. Allegedly, the scheme proceeded in the following manner. Sutton would advance monies from time to time to the IFC defendants for their personal use. At the next property closing for the project, the acquisition cost would be inflated to reflect the monies previously turned over to the IFC defendants. IFC would then pay Sutton this inflated figure. In this manner, the IFC defendants succeeded in concealing their diversion of corporate funds under the guise of capital expenditures for the project.

██ In this Circuit, the law concerning evidence of prior crimes is well-established.[10] As we stated in *United States v. Stirone,* 262 F.2d 571 (3d Cir. 1958); *rev'd*

---

**8.** Although this evidence primarily affected the IFC defendants, the non-IFC defendants also challenge its admissibility on the ground that they were unduly prejudiced by its introduction.

**9.** In its oral opinion permitting the introduction of this evidence, the district court also found it relevant to establish a *modus operandi* and a motive on the part of the IFC defendants.

**10.** At the time of the proceedings below, the new Federal Rules of Evidence were not yet in effect. However, we note that new Rule 404(b), dealing with evidence of prior crimes, is substantially the same as that previously applied in this Circuit.

*on other grounds,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960):

> "Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime."

262 F.2d at 576.

Of course, even when such evidence is otherwise admissible under this standard, the district court may, in an exercise of its sound discretion, exclude it if it determines that "the probative value of such evidence is substantially outweighed by the risk that its admission will create a substantial danger of undue prejudice." 262 F.2d at 576–77.

■ After analyzing Sutton's challenged testimony under the applicable rules of law, we find no error in the district court's admission of it into evidence. Although his testimony indicated prior criminal behavior on the part of the IFC defendants, it was clearly relevant to far more than the defendants' mere propensity to commit crime. In the first place, it cast light, as the district court correctly determined, on the relationship, if any, existing between Sutton and the IFC defendants. Since the government's case against the IFC defendants rested largely on Sutton's testimony, both the existence and the nature of this relationship were of critical importance to Sutton's credibility. In addition, the background information provided by this testimony enabled the jury to better understand Sutton's role in the bribery scheme as well as his testimony as a whole.

Secondly, this testimony helped establish a modus operandi further implicating the IFC defendants in the subsequent bribery scheme. Allegedly, the IFC defendants were to raise the funds necessary for at least the Ross bribe through the same "property closings" that they had previously used to raise money for their own benefit.

Finally, this evidence was relevant to show a motive on the part of the IFC defendants for their alleged attempt to secure the needed zoning variances through bribery. If the IFC defendants had indeed diverted large sums of corporate money to their own use under the pretense of property acquisitions for the project, a large project was essential to justify those expenditures. However, the Fort Lee zoning ordinances posed a formidable obstacle to the construction of that large project. Hence, it is not inconceivable that the IFC defendants would resort to bribery in order to obtain zoning variances permitting the large project needed to cover up their previous unlawful activities.

■ Nor do we believe that the prejudicial impact of this evidence "substantially out-weighed" its probative value so as to require its exclusion.[11] To be sure, the possibility always exists that a jury may misuse evidence which is introduced for a limited purpose. However, here, the district court took more than adequate measures to protect against such misuse. Rather than allowing Sutton to detail every transaction by which the IFC defendants had embezzled corporate funds, the court only permitted him to describe the mechanics of their scheme through four illustrative examples. Moreover, at no time was there any suggestion to the jury that these transactions were criminal. Indeed, prior to Sutton's testimony in this regard, the district court emphatically instructed the jury that the indictment did not charge the defendants with committing a crime as a result of these transactions. Finally, the court cautioned the jury time and time again that this evidence could only be considered against the IFC defendants, and against them, for only a limited purpose.

We are therefore convinced that the district court committed no abuse of its considerable discretion in permitting the introduction of this evidence.

---

11. In contesting the admissibility of this evidence, the non-IFC defendants argue that its prejudicial impact necessarily "spilled over" against them. Although we hold that this prejudice, if any, was insufficient to require the exclusion of this evidence, whether it entitled them to a severance from the IFC defendants is a separate issue which we will consider later.

III. *Issues Raised By Valentine and Valentine Electric:*

A. *Restrictions Placed on the Cross-Examination of Sutton:*

While conceding, as they must, that there was no complete denial of their right to cross-examine the unindicted co-conspirator Sutton, the defendants Valentine and Valentine Electric contend that this cross-examination was unduly restricted by certain rulings of the district court. Of the four alleged instances of error,[12] only two merit our discussion: (1) whether the district court abused its discretion in restricting the cross-examination of Sutton as to his previous plea of guilty; and (2) whether the district court erred in refusing to turn over to the defendants statements made by Sutton which were contained in his presentence report.

Prior to trial, Sutton had been permitted to plead guilty to a one count information charging him with conspiracy to violate, among other things, the Travel Act and a section of the Internal Revenue Code, entitled, "Fraud and False Statements, Declarations Under Penalty of Perjury", 26 U.S.C. § 7206(1). The charged conspiracy, insofar as it related to the Travel Act, dealt with the bribes of Ross and Serota. With respect to the second substantive offense mentioned, the charge had its basis in the IFC defendants' prior diversions of corporate funds in that Sutton was accused of aiding them in filing false tax returns which did not reflect those monies. The maximum penalty facing Sutton as a result of his plea to this single count information was a five year term of imprisonment and a $10,000 fine. Of course, had he been charged with and convicted of the various substantive offenses described in the information he could have received a much harsher punishment.

On cross-examination of Sutton, the attorney for Serota [13] sought to introduce the title of the tax statute which Sutton had been convicted of conspiring to violate. His stated purpose in doing so was to establish Sutton's knowledge that he had been permitted to plead to a single conspiracy to violate a number of federal statutes when he could have been charged separately with the substantive crimes set out in the information. However, it is also clear that he expected that Sutton's mere plea to a statute bearing that title would reflect adversely on his credibility.

This attempt to introduce the title of the tax statute was vigorously opposed by both the government and the attorney for the IFC defendant Dansker. The government took the position that the introduction of the title alone was misleading since Sutton had not pleaded guilty to filing a false tax return himself, but only to aiding the IFC defendants in doing so. Consequently, it manifested its intent to elicit that fact on redirect if the title to the statute was admitted. Counsel for Dansker, on the other hand, objected to any reference to a crime which might suggest that his client had committed an offense other than that charged in the indictment. Any such reference, he argued, would prejudice his client beyond repair.

Faced with these competing interests among the defendants, the district court refused to permit Serota's counsel to establish the name of the offense. In making this ruling, the court obviously agreed with the government that the title of the statute

---

12. We find no merit in defendants' argument that the district court unduly restricted their cross-examination of Sutton by refusing (a) to permit the introduction into evidence of certain documents during his cross-examination; and (b) to require the government to disclose the last name of Tony C. and to produce the grand jury testimony of Tony Citrupi, Ruth Golden and Harold Golden pursuant to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To the extent that the defendants other than Serota press his arguments that the district court erred in permitting Sutton to have before him, during cross-examination, documents by which he was being impeached, and in rehabilitating Sutton's testimony during cross-examination, we find them equally devoid of merit.

13. The attorney for Valentine and Valentine Electric indicated his intent to introduce the title of the tax statute if Serota's counsel failed to do so.

by itself was misleading under the circumstances and feared the inevitable prejudice to the IFC defendants which would occur if the offense was placed in its proper perspective. However, it did not completely foreclose all inquiry into Sutton's prior guilty plea. The defendants were allowed to establish, if they so desired, Sutton's realization that he could have been charged with far more than a single conspiracy. They were also permitted, and did explore, the fact that Sutton had pleaded guilty to a lesser offense expecting leniency in exchange for his plea and his cooperation with the government. Finally, counsel for Serota was allowed to quote extensively from the information insofar as it pertained to offenses other than the tax violation in an attempt to demonstrate an inconsistency between Sutton's guilty plea and his testimony at trial.

On appeal, Valentine and Valentine Electric contend that the district court's refusal to permit the introduction of the tax statute's title constitutes reversible error. The mere fact that Sutton had been convicted of a crime of that nature, they argue, had a serious and direct bearing on his credibility. Hence, while acknowledging that the district court's motives may have been "commendable", they assert that its exclusion of any reference to the statute's title frustrated the effectiveness of their cross-examination of a key prosecution witness and thus violated their right to conduct a meaningful cross-examination.

We disagree. The district court has wide discretion in determining the permissible scope of cross-examination. *E. g., United States v. Greenberg,* 419 F.2d 808 (3d Cir. 1969). Although normally the title of a prior crime committed by a witness may be elicited during his cross-examination in order to undermine his credibility, *Beaudine v. United States,* 368 F.2d 417 (5th Cir. 1966), we do not believe that the district court exceeded that discretion on the record before us.

In the first place, the mere fact that Sutton had pleaded guilty to a statute bearing that title would have been of little significance in discrediting his testimony. Any initial adverse impact on his credibility would have been severely diminished when his true role in the offense was subsequently exposed by the government. At the same time, the IFC defendants would have been unavoidably prejudiced when Sutton's offense was placed in its proper perspective. Under these circumstances, we believe that the district court wisely acted to preserve the IFC defendants' interests in obtaining a fair trial.

Moreover, we do not believe that the balance struck by the district court unduly restricted the non-IFC defendants' right to conduct a meaningful cross-examination. The evidence before the jury was more than sufficient for it to conduct a "discriminating appraisal" of Sutton's credibility. *See United States v. Mallah,* 503 F.2d 971 (2d Cir. 1974). The jury was fully aware of his prior conviction, his expectations of leniency and his previous unlawful activities. In addition, his credibility was repeatedly and severely assailed from every conceivable angle over a cross-examination which covered more than 1,100 pages of a 2,600 page transcript. In this context, we find no error in the district court's decision to exclude a few questions as to the title of a tax statute which were, at best, of limited probative value in discrediting Sutton's testimony. To the extent that any defendant other than Valentine and Valentine Electric seeks to advance this argument we find it equally lacking in merit.

We turn next to the defendants' contentions concerning statements by Sutton contained in his pre-sentence report. During the course of Sutton's cross-examination, counsel for Serota, in a motion joined in by the attorney for Valentine and Valentine Electric, called for the production of any recorded statements Sutton may have made to the probation department as well as the pre-sentence report prepared by it. In making this motion, he relied on both *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and the Jencks Act, 18 U.S.C. § 3500. After obtaining a copy of the report from the probation department

and reviewing it *in camera*, the court determined that, although it contained a typewritten statement signed by Sutton, neither it nor the statement were producible under either the Jencks Act or *Brady*. With respect to the Jencks Act the court added that, as a matter of policy, it did not believe that statements contained in pre-sentence reports were within its purview.

■ In maintaining that the district court erred in refusing to turn over the statement by Sutton contained in his pre-sentence report, the defendants seem to have abandoned the *Brady* argument pressed below. Rather, they appear to rely totally on the Jencks Act in asserting that the statement was subject to production.

The Jencks Act provides in pertinent part:

"(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement . . . of the witness *in the possession of the United States* which relates to the subject matter as to which the witness has testified." (emphasis added).

In speaking of statements "in the possession of the United States", we understand the statute to require production only of statements possessed by the prosecutorial arm of the federal government. *See Augenblick v. United States*, 377 F.2d 586, 597–98, 180 Ct.Cl. 131 (1967), *rev'd on other grounds*, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969); *United States v. Ehrlichman*, 389 F.Supp. 95 (D.D.C.1974). Hence, such statements possessed by, for example, the F.B.I. or a United States Attorney must be turned over to the defense on proper motion.

■ A pre-sentence report and statements contained therein, however, are not within the possession of the prosecution. Indeed, the prosecution has access to them only under limited circumstances, Fed.R. Crim.Proc. 32(c). Rather, a pre-sentence report is a confidential document prepared at the direction of the court solely for its use in imposing sentence. The probation department thus acts as an arm of the court in such preparation. *United States v. Greathouse*, 188 F.Supp. 765 (M.D.Ala., N.D.1960). We therefore find no error in the district court's refusal to turn over Sutton's statement contained in his pre-sentence report. Of course, to the extent that any defendants other than Valentine and Valentine Electric press this argument the same result applies.

### B. *Severance:*

Valentine and Valentine Electric next complain of the district court's failure to grant them a severance below. Prior to trial, the district court denied their motion brought pursuant to Rule 14, Fed.R.Crim. Proc., for a severance from IFC and the IFC defendants. They now contend that they were unduly prejudiced during the joint trial which followed by (a) the evidence admitted against the IFC defendants concerning their prior diversion of corporate funds; and (b) the restrictions placed by the court on their cross-examination of Sutton as to his prior guilty plea in order to protect the interests of the IFC defendants. They assert that the district court's failure to grant them a severance at the appearance of such prejudice deprived them of their right to a fair trial.

■ We find no merit in this argument. A motion for severance is addressed to the sound discretion of the district court. On appeal, the district court's denial of such a motion will not be disturbed absent an affirmative showing that the court's ruling resulted in such prejudice to the moving party that it amounted to an abuse of discretion. *United States v. De Larosa*, 450 F.2d 1057 (3d Cir. 1971). On the record before us, we see nothing close to the amount of prejudice needed to overturn the district court's decision.

We turn first to their contentions concerning the evidence of the IFC defendants' prior misconduct. In substance, Valentine and Valentine Electric argue that this evidence was so complex and so damning that its prejudicial impact necessarily spilled

over against them. Since they would have not been exposed to such prejudice in a separate trial, they assert that the district court erred in failing to grant them a severance.

■■■■■ We cannot agree. A defendant is not entitled to a severance merely because the evidence against a co-defendant is more damaging than that against him. If that were the case, a joint trial could rarely be held. Rather, in determining whether disparate proofs require a severance, the proper inquiry is whether the evidence is such that the jury cannot be expected to "compartmentalize" it and then consider it for its proper purposes. *United States v. De Larosa*, 450 F.2d at 1065.

■■■ In the instant case, we are convinced that the jury would have experienced little difficulty in "compartmentalizing" the evidence concerning the IFC defendants' prior diversion of corporate funds. Not only did this evidence implicate the IFC defendants alone, it related to a time period prior to the entry of Valentine and Valentine Electric into the bribery scheme. This chronological difference certainly aided the jury in marshalling the evidence admissible against each defendant. Moreover, this evidence concerned activities of the IFC defendants which were far different in kind than anything engaged in by Valentine and Valentine Electric during the bribery plot. Hence, the jury should have had little problem in distinguishing this evidence from that properly admitted against them. Finally, the court emphatically cautioned the jury time and time again that this evidence was only to be considered against the IFC defendants. In the light of these frequent and clear instructions, we can hardly assume that the jury nevertheless considered this evidence against Valentine and Valentine Electric. *See United States v. Barrow*, 363 F.2d 62, 67–68 (3d Cir. 1966).

Likewise, we do not believe that the restrictions placed on the cross-examination of Sutton so prejudiced Valentine and Valentine Electric that a severance was required. Once again, the defendants' argument in this regard focuses on the district court's frustration of their attempt to establish the title of the tax statute which Sutton had been convicted of conspiring to violate. To be sure, the defendants could have elicited this information in a separate trial. However, in that separate trial, the government would have certainly been permitted to place Sutton's offense in its proper perspective, thus diminishing its prejudicial impact on his credibility. Moreover, as we previously indicated, the defendants were allowed to conduct a more than adequate cross-examination of Sutton. Under all the circumstances, we do not believe that the defendants' inability to establish a fact of such limited probative value gave rise to such a degree of prejudice that a severance was mandated.

We therefore hold that the district court committed no abuse of discretion in failing to sever Valentine and Valentine Electric from the IFC defendants. We also reject any claim by the defendant Diaco that he was entitled to a severance on these same grounds.

### C. Comment on Valentine's Failure to Testify:

During the course of his summation, the prosecutor made the following statement:

"Then at 7:25 that evening from Mr. Serota's own home he places a telephone call to Valentine Electric Company, a four-minute conversation. If this is so honest and above board, and unassailable, why is Mr. Serota and Mr. Valentine talking the night of the 16th? What purpose?

*Counsel has given you no reason, no explanation for the relationship between Mr. Serota and Mr. Valentine.*" (emphasis added).

At that point, the attorneys for Serota and Valentine moved for a mistrial on the ground that the prosecutor's statement constituted a comment on their clients' failure to take the stand in violation of their fifth amendment rights. The district court denied the motion. However, it immediately

instructed the jury that the defendants had no obligation to testify in their own behalf and that no adverse inferences could be drawn from their failure to do so.

On appeal, Valentine argues that the court erred in denying his motion for a mistrial. He contends that the obvious purpose of the prosecutor's remark was to call attention to his failure to take the stand since the "explanation" called for by the prosecutor could only have been provided by his own testimony. Moreover, he maintains that this comment was so grossly prejudicial that its impact could not be vitiated by the district court's curative instructions.

 In determining whether a prosecutor's remark constitutes an improper comment on an accused's failure to take the stand in his own behalf, the proper test is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify". *United States v. Chaney*, 446 F.2d 571, 576 (3d Cir. 1971). After carefully examining both the contents of the prosecutor's statement and the context in which it was made, we are convinced that it was neither intended as such a comment nor of such a nature that the jury would necessarily construe it in that fashion.

We think it clear that the prosecutor was merely highlighting the failure of defense counsel, in their summations, to challenge critical evidence against their clients. The fact that Valentine and Serota had been conferring with one another at that particular time was certainly significant since it tended to establish a relationship between them during the period of the alleged bribery scheme and thus substantiated Sutton's testimony. However, while they offered explanations for much of the evidence in the case, neither Serota's nor Valentine's counsel made any effort to explain away this conversation in their closing arguments. In pointing out this failure on the part of defense counsel in his summation, the prosecutor was well within the bounds of legitimate advocacy. *E. g., United*

States v. Day, 384 F.2d 464 (3d Cir. 1967); *United States v. Joyner*, 160 U.S.App.D.C. 384, 492 F.2d 650 (1974).

In any event, the district court took more than adequate measures to protect against any possible prejudice to Valentine resulting from this single remark in the prosecutor's lengthy, but controlled, summation. Its immediate cautionary instructions insured that no juror would misconstrue the prosecutor's statement as an adverse comment on Valentine's failure to testify.

We therefore find no error in the district court's refusal to grant a mistrial on the ground that the prosecutor had improperly commented on Valentine's failure to take the stand in his own behalf.

### IV. *Issues Not Passed On By The District Court:*

#### A. *Exclusion of Newark Area Residents from the Jury:*

Prior to trial, defendant Diaco, along with a number of other defendants, moved for a dismissal of the indictment or, in the alternative, a change of venue or vicinage because of the allegedly adverse publicity given this case in the Newark area. As previously noted, the district court decided to select the jury from the Trenton area in response to the alternatives in this motion. However, in doing so, it made no findings as to whether the alleged publicity precluded a fair trial before a Newark jury. Rather, the requested change in vicinage was apparently granted to insure that no issue concerning such publicity would thereafter arise.

Diaco now claims that the adverse publicity which motivated his request for a change in vicinage was generated by the government. But for this publicity, he maintains, he would have been tried before a jury composed of residents of the Newark area, the vicinage in which the alleged crime occurred. Hence, he argues that the government, through this publicity, effectively excluded Newark area residents from the venire, and thus denied him his sixth

amendment right to be tried by a jury composed of a fair cross-section of the community.

█ In order to resolve Diaco's claim, findings as to both the nature and source of such publicity in the Newark area would be necessary. However, such findings are totally absent on the record before us. Moreover, in pressing this argument in this Court, Diaco has failed to point us to a single record reference—and our independent examination of the record discloses none—indicating that he raised this objection below. Accordingly, we can only conclude that this argument was not presented to the district court. Since it appears that this claim is now raised for the first time and that findings necessary to provide the factual predicate for its resolution were neither sought nor made in the district court, further consideration of Diaco's claim is unnecessary. See Government of Virgin Islands v. Gereau, 502 F.2d 914, 937 (3d Cir. 1974). This argument meets the same result to the extent it is put forward by any defendant other than Diaco.

### B. Denial of Haymes' Right to Counsel of His Choice:

During the pre-trial proceedings, a question arose as to the propriety of Haymes' attorney's continued representation of his client. Haymes' attorney had previously served as counsel for IFC and, in that capacity, apparently attended several meetings between Sutton and the IFC defendants. The government felt that as a result of his presence at those meetings he might possibly be called as a witness during the upcoming trial.

Upon learning of this problem, the district court directed all counsel to submit their positions on the issue in letter form. The responses were not particularly enlightening since the government merely reiterated its concern over Haymes' attorney's status as a potential witness while counsel for

Haymes' co-defendants essentially indicated that without further information they could take no position on the matter. Haymes' attorney, on the other hand, manifested his intent to remain in the case unless directed to do otherwise.

Thereafter, the court held an in camera hearing to further consider the issue. This hearing concluded with an order directing the government to prepare a delineation setting forth any anticipated testimony of Sutton relevant to the matter so that Haymes' attorney could make an informed decision as to the propriety of his continued participation in the case. However, before this delineation could be prepared, Haynes' attorney requested permission to withdraw with the approval of his client. The court granted this application nearly four months prior to the commencement of trial.

█ Haymes now contends that the actions of both the district court and the government effectively "forced" his attorney out of the case and thus denied him his sixth amendment right to counsel of his choice.[14] However, no factual support for this contention appears on the record before us. Rather, the record merely indicates that the court began investigating a potential conflict of interest problem bearing on the propriety of Haymes' attorney's continued representation of his client, and that before this matter could be resolved, Haymes' attorney voluntarily withdrew from the case with the consent, albeit reluctant, of his client. Because of this voluntary withdrawal, the district court was never called upon to determine whether the alleged conflict of interest was such that it necessitated the withdrawal of Haymes' attorney or what consequences a withdrawal under those circumstances would have on Haymes' right to counsel of his choice. Since it thus appears on this record that the voluntary withdrawal of counsel prevented his sixth amendment claim from ever materializing in the district court, we decline to grant it any further consideration.

---

**14.** To the extent that Haymes' asserts that the district court erred in refusing to grant him a severance on this basis, we find no merit in his argument.

### C. *Brady Claim re: James Silver:*

During the course of both pre-trial proceedings and the trial itself, the defendants made repeated motions pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), seeking the disclosure of any exculpatory information in the possession of the government. In response to these repeated requests, the government, acknowledging its "continuing duty" under *Brady* to provide the defense with such information, represented that it had discharged such obligation. Indeed, it turned over a great deal of material. In addition, the district court accepted the prosecution's representations with respect to its *Brady* obligations.

The defendants now contend that the government violated its *Brady* duties by failing to disclose to them the existence of one James Silver and the contents of communications made by him to representatives of the F.B.I. and the United States Attorney's Office for the District of New Jersey. The defendants assert that this information, which was in the government's possession prior to trial, would have materially aided them in discrediting the testimony of Sutton, the government's key witness. The government, on the other hand, while admitting that such information was in its possession, vigorously argues that it was not the subject matter of *Brady* production, and even if so, that its failure to disclose it to the defendants was harmless.

No *Brady* claim concerning Silver, however, was presented to the district court during either the trial or the post-trial proceedings. This claim was raised for the first time in a motion filed with this Court seeking the disclosure of all documentary evidence concerning Silver in the government's possession. The government responded to this motion by filing the requested materials *in camera* with this Court. After examination, we directed that it be turned over to the defendants in order that they might determine whether to pursue their claim. Thereafter, these documents became the subject matter of oral argument before this Court and we permitted counsel to submit post-argument briefs in support of their positions.

After due consideration, we find it inappropriate to resolve defendants' *Brady* claim in the first instance. The defendants' allegations concerning Silver, if true, are relevant to the establishment of cause for a new trial. As such, they should be first presented to the district court on an appropriate Rule 33, Fed.R.Crim.Proc., motion. Of course, our decision in this response is without prejudice to any action which the defendants may wish to take in the district court. And, since we decline to pass on this matter, we express no opinion on the merits of defendants' *Brady* claim. *United States v. McCrane*, 527 F.2d 906, 914 (3d Cir. 1975).

We have considered all other contentions raised by the defendants and find them without merit.[15]

Accordingly, the judgments of conviction of all defendants under Count III of the indictment will be reversed and this case remanded to the district court with directions to enter judgments of acquittal for the defendants on that count. The defendants' convictions under Count I will be vacated and the cause remanded for further proceedings not inconsistent with this opinion. The judgments of conviction on Count II will be affirmed.

---

**15.** These contentions include the government's alleged *Brady* violation in refusing to disclose, prior to trial, any testimony of Sutton that was the basis for the second indictment in this prosecution which contradicted the allegations contained in the third indictment.